**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CARMINE VITOLO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BRASKEM S.A., CARLOS JOSÉ FADIGAS DE SOUZA FILHO, MÁRIO AUGUSTO DA SILVA, BERNARDO AFONSO DE ALMEIDA GRADIN and MARCELA APARECIDA DREHMER ANDRADE<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Carmine Vitolo ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by BRASKEM S.A. ("Braskem" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Braskem; and (c) review of other publicly available information concerning Braskem.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of all persons or entities who purchased or otherwise acquired Braskem American Depositary Receipts ("ADR") between June 1, 2010 and March 11, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Braskem is the largest petrochemicals producer in Latin America by sales. The Company is also the largest producer of thermoplastic resins in the Americas.

3. Petróleo Brasileiro S.A. ("Petrobras") is an integrated oil and gas company that is involved in the exploration, development, production, refining, marketing, transportation, and distribution of oil and gas products. Petrobras is currently the second largest shareholder in Braskem, with an approximately 36% stake.

4. Petrobras is currently in the midst of a massive corruption scandal that has involved Brazil's top political officials, including the country's President. On September 7, 2014, the *New York Times* published an article about details of a widespread kickback scheme involving Petrobras and Brazilian political figures, including three governors, the energy

minister and more than 30 legislators. According to the article, the confidential testimony of Paulo Roberto Costa ("Costa"), a former Petrobras executive who oversaw refining operations until 2012 was provided as part of a plea deal. According to Costa, the kickback scheme involved the billing of contracts for oil projects, and the politicians benefited by receiving three percent of the value of the contract

5. On March 11, 2015, an article was published in the Brazilian news source *Folha de S. Paulo* stating that Costa and admitted money launderer Alberto Youssef testified that Braskem paid annual bribes, on average of $5 million per year, to buy crude derivatives such as naphtha and propylene at low prices from 2006 to 2012.

6. On this news, shares of Braskem ADRs declined $1.72 per share, over 20%, to close on March 11, 2015, at $6.71 per share, on unusually heavy volume.

7. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company was engaged in the payment of annual bribes to Petrobras; (2) that such payments were made to purchase crude derivatives at low prices; (3) that, as a result, the Company's crude derivatives costs were maintained at artificially low prices; (4) that the Company lacked adequate internal controls; and (5) that, as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13. Plaintiff Carmine Vitolo, as set forth in the accompanying certification, incorporated by reference herein, purchased Braskem ADRs during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Braskem is a Brazil corporation with its principal executive offices located at Rua Eteno, 1561, Polo Petroquimico de Camacari, Camacari, Bahia - CEP 42810-000 Brazil.

15. Defendant Carlos José Fadigas de Souza Filho ("Filho") is, and at all relevant times was, the Company's president and Chief Executive Officer ("CEO").

16. Defendant Mário Augusto da Silva ("da Silva") is the Company's CFO, and was appointed to this role in or around June 2013.

17. Defendant Bernardo Afonso de Almeida Gradin ("Gradin") was the Chief Executive Officer ("CEO") of Braskem from July 2008 until December 2010

18. Defendant Marcela Aparecida Drehmer Andrade ("Andrade") was, at all relevant times, the Company's CFO until her resignation in or around June 2013.

19. Defendants Filho, da Silva, Gradin and Andrade are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Braskem's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

20. Braskem is the largest petrochemicals producer in Latin America by sales. The Company is also the largest producer of thermoplastic resins in the Americas.

### Materially False and Misleading Statements Issued During the Class Period

21. On June 1, 2010, the Company filed its Annual Report with the SEC on Form 20-F for the 2009 fiscal year. The Company's Form 20-F was signed by Defendants Gradin and Andrade.

22. The Company's Form 20-F contained required Sarbanes-Oxley certifications, signed by Gradin and Andrade, who certified:

> 1. I have reviewed this annual report on Form 20-F of Braskem S.A.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;
>
> 4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and
>
> 5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

23. On June 10, 2011, the Company filed its Annual Report with the SEC on Form 20-F for the 2010 fiscal year (the "2010 Form 20-F"). For the fiscal year ended December 31, 2010, the Company reported a gross profit of $2.4 billion on revenues of over $15 billion. The Company's Form 20-F was signed by Defendant Filho. The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Defendants Filho and Andrade, substantially similar to the certifications contained in ¶21, *supra*.

24. With respect to the Company's contracts with Petrobras, the 2010 Form 20-F, in relevant part, stated

**Supply Contracts with Petrobras**
In July 2009, we and Petrobras entered into a Petrochemical Naphtha Purchase and Sale Contract, which we have operated under since March 2009. This contract replaced the naphtha supply contract between our company and Petrobras for the supply of naphtha to our basic petrochemicals plants located in the Northeastern Complex, which was terminated in June 2008, and superseded the naphtha supply contract between our company and Petrobras for the supply of naphtha to our basic petrochemicals plants located in the Southern Complex. This contract has a term of five years, expiring in March 2014, and is automatically renewable for one five-year period, unless either party notifies the other party in writing at least one year prior to the expiration of the contract that it does not intend to renew the contract.

Under the terms of this contract:

· Petrobras has agreed to sell and deliver naphtha to our basic petrochemicals plants in the Northeastern Complex and the Southern Complex exclusively for our use as a raw material;

· we are required to purchase and Petrobras is required to deliver a minimum monthly volume of naphtha;

· we provide Petrobras with a firm commitment order for naphtha each month, together with an estimate of the volume of naphtha that we will purchase over the following six months;

· we may request volumes of naphtha that exceed a monthly firm commitment order, which Petrobras may supply at its discretion;

· since March 2009, the price that we pay for naphtha is based on a variety of factors, including the market prices of naphtha and a variety of petrochemical derivatives, the volatility of the prices of these products in the international markets, the real/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered;

· the contract will be amended in the event that unforeseen extraordinary events occur that cause a disruption in the economic-financial equilibrium of the contract; and

· Petrobras may terminate the contract, without prior notice, in the event of: (1) our failure to cure any breach of the contract following a 30 day grace period; (2) a force majeure event that continues for more than 90 days; (3) we transfer or

offer as a guaranty all or part of our rights and obligations under the contract to a third party without Petrobras' consent; (4) an alteration of our ownership or corporate purposes that conflicts with the object of the contract; or (5) our dissolution, bankruptcy or liquidation.

25. Additionally, with respect to compliance, the 2010 Form 20-F in relevant part, stated:

***Personnel and Corporate Issues Committee***

Our Personnel and Corporate Issues Committee meets quarterly and has the following duties: (1) to evaluate new policies and review existing policies relating to personnel matters and organizational issues, (2) to analyze processes relating to identification, training, development and succession of executives for or in strategic positions, (3) to analyze processes relating to the determination of fixed and variable compensation for executives in strategic positions, (4) to analyze issues relating to compliance with our Code of Conduct, and (5) to evaluate new policies and review existing policies relating the maintenance and strengthening of our corporate culture. Our Personnel and Corporate Issues Committee is currently composed of José Carlos Cosenza, Daniel Bezerra Villar, Álvaro Fernandes da Cunha Filho and Jairo Elias Flor.

***Corporate Governance Guidelines***

The NYSE corporate governance standards require that a listed company must adopt and disclose corporate governance guidelines that address certain minimum specified standards which include: (1) director qualification standards; (2) director responsibilities; (3) director access to management and independent advisors; (4) director compensation; (5) director orientation and continuing education; (6) management succession; and (7) annual performance evaluation of the board of directors.

Braskem has adopted the BM&FBOVESPA's corporate governance rules for Level 1 companies and must also comply with certain corporate governance standards set forth under Brazilian Corporation Law. See "Item 9. The Offer and Listing—Trading on the BM&FBOVESPA—BM&FBOVESPA Corporate Governance Standards." The Level 1 rules do not require Braskem to adopt and disclose corporate governance guidelines covering the matters set forth in the NYSE's corporate governance standards. However, certain provisions of Brazilian Corporation Law that are applicable to Braskem address certain aspects of director qualifications standards and director responsibilities.

***Code of Business Conduct and Ethics***

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers

> and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; (4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavior.
>
> Although the adoption of a code of business conduct is not required by Brazilian law, Braskem has adopted a code of business conduct applicable to its directors, officers and employees, which addresses each of the items listed above. Braskem's code of business conduct is available on Braskem's websiteat www.braskem.com.br. The information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. No waivers of the provisions of the code of business conduct are permitted, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council.

26. On April 10, 2012, the Company filed its Annual Report with the SEC on Form 20-F for the 2011 fiscal year ("the 2011 Form 20-F"). For the fiscal year ended December 31, 2011, the Company reported a gross profit of $2.05 billion on revenues of over $17.6 billion. The Company's Form 20-F was signed by CEO Filho. The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Filho and Andrade, substantially similar to the certifications contained in ¶21, *supra*.

27. With respect to the Company's contracts with Petrobras, the 2011 Form 20-F, in relevant part, stated

> **Supply Contracts with Petrobras**
>
> In July 2009, we and Petrobras entered into a Petrochemical Naphtha Purchase and Sale Contract, which we have operated under since March 2009. This contract replaced the naphtha supply contract between our company and Petrobras for the supply of naphtha to our basic petrochemicals plants located in the Northeastern Complex, which was terminated in June 2008, and superseded the naphtha supply contract between our company and Petrobras for the supply of naphtha to our basic petrochemicals plants located in the Southern Complex. This contract has a term of five years, expiring in March 2014, and is automatically renewable for one five-year period, unless either party notifies the other party in writing at least one year prior to the expiration of the contract that it does not intend to renew the contract.

Under the terms of this contract:

· Petrobras has agreed to sell and deliver naphtha to our basic petrochemicals plants in the Northeastern Complex and the Southern Complex exclusively for our use as a raw material;

· we are required to purchase and Petrobras is required to deliver a minimum monthly volume of naphtha;

· we provide Petrobras with a firm commitment order for naphtha each month, together with an estimate of the volume of naphtha that we will purchase over the following six months;

· we may request volumes of naphtha that exceed a monthly firm commitment order, which Petrobras may supply at its discretion;

· since March 2009, the price that we pay for naphtha is based on a variety of factors, including the market prices of naphtha and a variety of petrochemical derivatives, the volatility of the prices of these products in the international markets, the real/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered;

· the contract will be amended in the event that unforeseen extraordinary events occur that cause a disruption in the economic-financial equilibrium of the contract; and

· Petrobras may terminate the contract, without prior notice, in the event of: (1) our failure to cure any breach of the contract following a 30 day grace period; (2) a force majeure event that continues for more than 90 days; (3) we transfer or offer as a guaranty all or part of our rights and obligations under the contract to a third party without Petrobras' consent; (4) an alteration of our ownership or corporate purposes that conflicts with the object of the contract; or (5) our dissolution, bankruptcy or liquidation.

28. Additionally, with respect to compliance, the 2011 Form 20-F in relevant part, stated:

***Personnel and Corporate Issues Committee***

Our Personnel and Corporate Issues Committee meets quarterly and has the following duties: (1) to evaluate new policies and review existing policies relating to personnel matters and organizational issues, (2) to analyze processes relating to identification, training, development and succession of executives for or in strategic positions, (3) to analyze processes relating to the determination of fixed

and variable compensation for executives in strategic positions, (4) to analyze issues relating to compliance with our Code of Conduct, and (5) to evaluate new policies and review existing policies relating the maintenance and strengthening of our corporate culture. Our Personnel and Corporate Issues Committee is currently composed of José Carlos Cosenza, Daniel Bezerra Villar, Álvaro Fernandes da Cunha Filho and Jairo Elias Flor.

***Corporate Governance Guidelines***

The NYSE corporate governance standards require that a listed company must adopt and disclose corporate governance guidelines that address certain minimum specified standards which include: (1) director qualification standards; (2) director responsibilities; (3) director access to management and independent advisors; (4) director compensation; (5) director orientation and continuing education; (6) management succession; and (7) annual performance evaluation of the board of directors.

Braskem has adopted the BM&FBOVESPA's corporate governance rules for Level 1 companies and must also comply with certain corporate governance standards set forth under Brazilian Corporation Law. See "Item 9. The Offer and Listing—Trading on the BM&FBOVESPA—BM&FBOVESPA Corporate Governance Standards." The Level 1 rules do not require Braskem to adopt and disclose corporate governance guidelines covering the matters set forth in the NYSE's corporate governance standards. However, certain provisions of Brazilian Corporation Law that are applicable to Braskem address certain aspects of director qualifications standards and director responsibilities.

***Code of Business Conduct and Ethics***

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; (4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavior.

Although the adoption of a code of business conduct is not required by Brazilian law, Braskem has adopted a code of business conduct applicable to its directors, officers and employees, which addresses each of the items listed above. Braskem's code of business conduct is available on Braskem's websiteat www.braskem.com.br. The information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. No waivers of the provisions of the code of business conduct are permitted, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council.

29. On April 8, 2013, the Company filed its Annual Report with the SEC on Form 20-F for the 2012 fiscal year ("the 2012 Form 20-F"). The Company's Form 20-F was signed by Defendant Filho. The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Defendants Filho and Andrade, substantially similar to the certifications contained in ¶21, *supra*.

30. With respect to the Company's contracts with Petrobras, the 2012 Form 20-F, in relevant part, stated:

> *Commercial Transactions with Petrobras*
>
> In July 2009, we and Petrobras entered into a Petrochemical Naphtha Purchase and Sale Contract under which Petrobras supplies naphtha to our basic petrochemical plants located in the Northeastern Complex and the Southern Complex. This contract has a term of five years, expiring in March 2014, and is automatically renewable for one five-year period, unless either party notifies the other party in writing at least one year prior to the expiration of the contract that it does not intend to renew the contract. Under this supply contract, the price that we pay for naphtha is based on a variety of factors, including the market prices of naphtha and a variety of petrochemical derivatives, the volatility of the prices of these products in the international markets, the real/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.
>
> In May 2006, Quattor Química (currently known as Braskem Qpar) and Petrobras entered into a Petrochemical Naphtha Purchase and Sale Contract for the supply of naphtha to our basic petrochemicals plants located in São Paulo Complex. The initial term of this contract expired in December 2010. In October 2010, this contract was amended to extend the term of this contract until February 2014 and provide that the contract is renewable for one five-year period, unless either party notifies the other party in writing at least one year prior to the expiration of the contract that it does not intend to renew the contract. Under the terms of this contract, the price that we pay for naphtha under this contract is based on a variety of factors, including the market prices of naphtha and a variety of petrochemical derivatives, the volatility of the prices of these products in the international markets, the real/U.S. dollar exchange rate, and the level of paraffinicity of the naphtha that is delivered.
>
> In December 2000, RioPol and Petrobras entered into an ethane and propane supply agreement. The initial term of this contract expires in 2021 and this agreement is automatically renewable for one two-year period, unless either party

notifies the other party in writing, at least one year prior to the expiration of the contract, that it does not intend to renew this agreement. Under the terms of this agreement, the price for ethane and propane is based on the U.S. Marketscan Mont Belvieu price.

In January 2005, Quattor Química (currently known as Braskem Qpar) and Petrobras entered into an agreement for the purchase and sale of a chain of light refinery hydrocarbons, from which we separate ethylene and propylene. This agreement provides that we and Petrobras will negotiate the renewal of this agreement prior to its expiration in 2020 and that, in the event that Petrobras does not intend to renew this agreement, it must notify us at least two years prior to the expiration of this agreement and must perform under the terms and conditions of this agreement until 2028. Under the terms of this agreement, the price for light refinery hydrocarbons is based on a variety of market indices.

In March 2007, we entered into two five-year propylene supply contract with REFAP, a subsidiary of Petrobras, for the supply of propylene to our plants in the Southern Complex. In addition, we sell condensate and purchase naphtha from REFAP.

In May 2008, we entered into a 20-year propylene supply contract with Petrobras for our Paulínia plant. Under this contract, we are obligated to purchase 300,000 tons of propylene per year.

Between May 2001 and February 2006, Braskem Petroquímica (formerly known as Quattor Petroquímica) and Petrobras entered into five propylene supply agreements. Each contract has an initial term of 20 years and the terms of each of these agreements is automatically renewable for a five-year period, unless either party notifies the other party in writing, at least six months prior to the expiration of the contract, that it does not intend to renew the agreement. Under the terms of these agreements, the price that we pay for propylene under these contracts is based primarily on the ICIS-LOR price for propylene in the U.S. Gulf Coast.

In January 2012, we entered into a three-year caustic soda supply contract with Petrobras under which we will supply approximately 68,000 tons of caustic soda for use by Petrobras' Brazilian refineries. This contract expires in January 2015.

We purchased raw materials from Petrobras and its subsidiaries of R$15,980.0 million in 2013 and sold products to Petrobras and its subsidiaries of R$1,369.9 million in 2013. We had accounts payable to Petrobras and its subsidiaries in an aggregate amount of R$1,833.0 million at 2013, and we had accounts receivable from Petrobras and its subsidiaries in an aggregate amount of R$187.3 million as of December 31, 2013.

31. With respect to the Company's crude derivatives, the 2012 Form 20-F, in relevant part, stated:

> We depend on Petrobras to supply us with a substantial portion of our naphtha, ethane and propane requirements.
>
> Petrobras is the only Brazilian supplier of naphtha and has historically supplied approximately 70% of the naphtha consumed by our Basic Petrochemicals Unit. Petrobras produces most of the naphtha it sells to us and imports the balance. Petrobras currently is also the only Brazilian supplier of ethane and propane and has historically supplied all of the ethane and propane consumed by our subsidiary Rio Polímeros S.A., or RioPol, which operates the petrochemical complex located in Duque de Caxias in the State of Rio de Janeiro, or the Rio de Janeiro Complex.
>
> Our production volume and net sales revenue would likely decrease and our overall financial performance would likely be negatively affected in the event of the following:
>
> · significant damage to Petrobras' refineries or to the port facilities through which Petrobras imports naphtha, or to any of the pipelines connecting our plants to Petrobras' facilities, whether as a consequence of an accident, natural disaster, fire or otherwise; or
>
> · any termination by Petrobras of the naphtha, ethane or propane supply contracts with our company, which provide that Petrobras may terminate the contracts for certain reasons described in "Item 4. Information on the Company—Basic Petrochemicals Unit—Raw Materials of Our Basic Petrochemicals Unit."
>
> In addition, although regulatory changes have ended Petrobras' monopoly in the Brazilian naphtha market and have allowed us to import naphtha, any reversal in the continuing deregulation of the oil and gas industry in Brazil could increase our production costs.
>
> The costs incurred in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting.

32. Additionally, with respect to compliance, the 2012 Form 20-F in relevant part, stated:

***Personnel and Corporate Issues Committee***

Our Personnel and Corporate Issues Committee meets quarterly and has the following duties: (1) to evaluate new policies and review existing policies relating to personnel matters and organizational issues, (2) to analyze processes relating to identification, training, development and succession of executives for or in strategic positions, (3) to analyze processes relating to the determination of fixed and variable compensation for executives in strategic positions, (4) to analyze issues relating to compliance with our Code of Conduct, and (5) to evaluate new policies and review existing policies relating the maintenance and strengthening of our corporate culture. Our Personnel and Corporate Issues Committee is currently composed of José Carlos Cosenza, Daniel Bezerra Villar, Álvaro Fernandes da Cunha Filho and Jairo Elias Flor.

***Corporate Governance Guidelines***

The NYSE corporate governance standards require that a listed company must adopt and disclose corporate governance guidelines that address certain minimum specified standards which include: (1) director qualification standards; (2) director responsibilities; (3) director access to management and independent advisors; (4) director compensation; (5) director orientation and continuing education; (6) management succession; and (7) annual performance evaluation of the board of directors.

Braskem has adopted the BM&FBOVESPA's corporate governance rules for Level 1 companies and must also comply with certain corporate governance standards set forth under Brazilian Corporation Law. See "Item 9. The Offer and Listing—Trading on the BM&FBOVESPA—BM&FBOVESPA Corporate Governance Standards." The Level 1 rules do not require Braskem to adopt and disclose corporate governance guidelines covering the matters set forth in the NYSE's corporate governance standards. However, certain provisions of Brazilian Corporation Law that are applicable to Braskem address certain aspects of director qualifications standards and director responsibilities.

***Code of Business Conduct and Ethics***

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; (4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavior.

Although the adoption of a code of business conduct is not required by Brazilian law, Braskem has adopted a code of business conduct applicable to its directors,

> officers and employees, which addresses each of the items listed above. Braskem's code of business conduct is available on Braskem's website at www.braskem.com.br. The information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. No waivers of the provisions of the code of business conduct are permitted, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council.

33. On April 14, 2014, the Company filed its Annual Report with the SEC on Form 20-F for the 2013 fiscal year ("the 2013 Form 20-F"). The Company's Form 20-F was signed by Defendant Filho. The Company's Form 20-F also contained Sarbanes-Oxley required certifications, signed by Defendants Filho and da Silva, substantially similar to the certifications contained in ¶21, *supra*.

34. With respect to the Company's contracts with Petrobras, the 2013 Form 20-F, in relevant part, stated:

> We have entered into the following supply contracts with Petrobras:
>
> · A Petrochemical Naphtha Purchase and Sale Contract that we and Petrobras entered into in 2009. See "Item 4—Information on the Company—Supply Contracts and Pricing of the Basic Petrochemicals Unit—Supply Contracts with Petrobras" for more information.
>
> · A Petrochemical Naphtha Purchase and Sale Contract that we and Petrobras entered into in May 2006. See "Item 4—Information on the Company—Supply Contracts and Pricing of the Basic Petrochemicals Unit—Supply Contracts with Petrobras" for more information.
>
> · An ethane and propane supply agreement that RioPol and Petrobras entered into in December 2000. See "Item 4—Information on the Company—Supply Contracts and Pricing of the Basic Petrochemicals Unit—Ethane and Propane" for more information.
>
> · An agreement for the purchase and sale of a chain of light refinery hydrocarbons, that Quattor Química (currently known as Braskem Qpar) and Petrobras entered into in January 2005. See "Item 4—Information on the Company—Supply Contracts and Pricing of the Basic Petrochemicals Unit—Light Refinery Hydrocarbons" for more information.

· Two five-year propylene supply contracts that we and REFAP, a subsidiary of Petrobras, entered into in March 2007, a subsidiary of Petrobras. See "Item 4—Information on the Company—Raw Materials of Our Polyolefins Unit—Propylene Contracts with Petrobras and its Subsidiaries" for more information.

· A 20-year propylene supply contract we and Petrobras entered into in May 2008 for our Paulínia plant. See "Item 4—Information on the Company—Raw Materials of Our Polyolefins Unit—Propylene Contracts with Petrobras and its Subsidiaries" for more information.

· Five propylene supply agreements that Braskem Petroquímica (formerly known as Quattor Petroquímica) and Petrobras entered into between May 2001 and February 2006. See "Item 4—Information on the Company—Raw Materials of Our Polyolefins Unit—Propylene Contracts with Petrobras and its Subsidiaries" for more information.

· A three-year caustic soda supply contract that we Petrobras entered into January 2012, under which we will supply approximately 68,000 tons of caustic soda for use by Petrobras' Brazilian refineries. This contract expires in January 2015.

We purchased raw materials from Petrobras and its subsidiaries of R$15,980.0 million in 2013 and sold products to Petrobras and its subsidiaries of R$1,369.9 million in 2013. We had accounts payable to Petrobras and its subsidiaries in an aggregate amount of R$1,833.0 million at 2013, and we had accounts receivable from Petrobras and its subsidiaries in an aggregate amount of R$187.3 million as of December 31, 2013.

35. With respect to the Company's crude derivatives, the 2012 Form 20-F, in relevant part, stated:

We depend on Petrobras to supply us with a substantial portion of our naphtha, ethane and propane requirements.

Petrobras is the only Brazilian supplier of naphtha and has historically supplied approximately 70% of the naphtha consumed by our Basic Petrochemicals Unit. Petrobras produces most of the naphtha it sells to us and imports the balance. Petrobras currently is also the only Brazilian supplier of ethane and propane and has historically supplied all of the ethane and propane consumed by our subsidiary Rio Polímeros S.A., or RioPol, which operates the petrochemical complex located in Duque de Caxias in the State of Rio de Janeiro, or the Rio de Janeiro Complex.

Our production volume and net sales revenue would likely decrease and our overall financial performance would likely be negatively affected in the event of the following:

· significant damage to Petrobras' refineries or to the port facilities through which Petrobras imports naphtha, or to any of the pipelines connecting our plants to Petrobras' facilities, whether as a consequence of an accident, natural disaster, fire or otherwise; or

· any termination by Petrobras of the naphtha, ethane or propane supply contracts with our company, which provide that Petrobras may terminate the contracts for certain reasons described in "Item 4. Information on the Company—Basic Petrochemicals Unit—Raw Materials of Our Basic Petrochemicals Unit."

In addition, although regulatory changes have ended Petrobras' monopoly in the Brazilian naphtha market and have allowed us to import naphtha, any reversal in the continuing deregulation of the oil and gas industry in Brazil could increase our production costs.

The costs incurred in connection with the exploration, appraisal, development and production of oil and gas are accounted for using the successful efforts method of accounting.

36. Additionally, with respect to compliance, the 2013 Form 20-F in relevant part, stated:

***Personnel and Corporate Issues Committee***

Our Personnel and Corporate Issues Committee meets quarterly and has the following duties: (1) to evaluate new policies and review existing policies relating to personnel matters and organizational issues, (2) to analyze processes relating to identification, training, development and succession of executives for or in strategic positions, (3) to analyze processes relating to the determination of fixed and variable compensation for executives in strategic positions, (4) to analyze issues relating to compliance with our Code of Conduct, and (5) to evaluate new policies and review existing policies relating the maintenance and strengthening of our corporate culture. Our Personnel and Corporate Issues Committee is currently composed of José Carlos Cosenza, Daniel Bezerra Villar, Álvaro Fernandes da Cunha Filho and Jairo Elias Flor.

***Corporate Governance Guidelines***

The NYSE corporate governance standards require that a listed company must adopt and disclose corporate governance guidelines that address certain minimum specified standards which include: (1) director qualification standards; (2) director responsibilities; (3) director access to management and independent advisors; (4)

director compensation; (5) director orientation and continuing education; (6) management succession; and (7) annual performance evaluation of the board of directors.

Braskem has adopted the BM&FBOVESPA's corporate governance rules for Level 1 companies and must also comply with certain corporate governance standards set forth under Brazilian Corporation Law. See "Item 9. The Offer and Listing—Trading on the BM&FBOVESPA—BM&FBOVESPA Corporate Governance Standards." The Level 1 rules do not require Braskem to adopt and disclose corporate governance guidelines covering the matters set forth in the NYSE's corporate governance standards. However, certain provisions of Brazilian Corporation Law that are applicable to Braskem address certain aspects of director qualifications standards and director responsibilities.

***Code of Business Conduct and Ethics***

The NYSE corporate governance standards require that a listed company must adopt and disclose a code of business conduct and ethics for directors, officers and employees and promptly disclose any waivers of the code for directors or officers. Each code of business conduct and ethics should address the following matters: (1) conflicts of interest; (2) corporate opportunities; (3) confidentiality; (4) fair dealing; (5) protection and proper use of company assets; (6) compliance with laws, rules and regulations (including insider trading laws); and (7) encouraging the reporting of any illegal or unethical behavior.

Although the adoption of a code of business conduct is not required by Brazilian law, Braskem has adopted a code of business conduct applicable to its directors, officers and employees, which addresses each of the items listed above. Braskem's code of business conduct is available on Braskem's website at www.braskem.com.br. The information included on our website or that might be accessed through our website is not included in this annual report and is not incorporated into this annual report by reference. No waivers of the provisions of the code of business conduct are permitted, except that the restrictions on outside activities do not apply to Braskem's directors and members of its fiscal council.

37. The statements contained in ¶¶20-36 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was engaged in the payment of annual bribes to Petrobras; (2) that such payments were made to purchase crude derivatives at low prices; (3) that, as a result, the Company's crude derivatives costs were maintained at artificially low prices; (4) that the Company lacked adequate internal

controls; and (5) that, as a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis.

**The Truth Emerges**

38. On March 11, 2015, an article was published in the Brazilian news source *Folha de S. Paulo*, stating that ex-Petrobras executive Paulo Roberto Costa and admitted money launderer Alberto Youssef testified that Braskem paid annual bribes, on average of $5 million per year, to buy crude derivatives such as naphtha and propylene at low prices from 2006 to 2012.

39. On this news, shares of Braskem ADRs declined $1.72 per share, over 20%, to close on March 11, 2015, at $6.71 per share, on unusually heavy volume.

40. On March 15, 2014, an article was published in *Bloomberg* entitled, "Petrobras Scandal Widening as Braskem Named in Morass." Therein, the article, in relevant part, stated:

> The staggering reach of Petroleo Brasileiro SA's corruption scandal is getting even bigger.
>
> Braskem SA, Latin America's biggest petrochemicals maker by sales, became the latest company implicated in testimony alleging it paid bribes to the state-controlled oil producer in return for contracts. While Braskem denied the accusations, its $750 million of bonds due 2024 plummeted 7.9 percent last week, the most among high-grade emerging-market debt.
>
> The allegations against Braskem underscore how pervasive the alleged kickbacks were in Brazil, where more than a million people took to the streets over the weekend to protest corruption. The federal investigation has already embroiled the nation's biggest builders and rig makers while fueling losses in the bonds of banks, the government and even a state pension fund.
>
> "The whole scandal is damaging more and more Brazilian companies from all segments, and Braskem can be seen as the latest example," Leonardo Kestelman, a money manager at Dinosaur Securities, said by telephone from Sao Paulo. "People just prefer to hit the sell button instead of waiting."
>
> Sao Paulo-based Braskem denied any irregularities in its dealings with Petrobras in e-mail to Bloomberg News on March 11.

**'Transparent Manner'**

"All the payments and contracts between Braskem and Petrobras followed the legal requirements and were approved in a transparent manner in accordance with the governance rules of both companies," Braskem said.

Braskem's 6 billion reais ($1.8 billion) in cash and revolving credit facilities are enough to cover debt payments for the next 47 months, the company said in a separate e-mail on March 13 in response to questions about its bond performance.

"Braskem understands that the oscillation of its securities doesn't reflect its credit quality," the company said. Braskem also said that most of its revenue is tied to the dollar, which has surged against the real.

The local currency gained 0.7 percent to 3.2253 per dollar at 2:23 p.m. in New York.

Braskem paid annual bribes, initially set at $5 million, to buy crude derivatives such as naphtha and propylene at low prices from 2006 to 2012, ex-Petrobras executive Paulo Roberto Costa and admitted money launderer Alberto Youssef said in testimony published on the Supreme Court's website on March 6.

Costa's and Youssef's sentence-reduction agreements forbid them and their lawyers from commenting on the investigations into alleged kickbacks at Petrobras.

**Braskem Shareholders**

Petrobras didn't respond to an e-mail seeking comment on the allegations against Braskem.

Braskem buys naphtha, which accounts for half of its production costs and is the main ingredient for making petrochemicals in Brazil, from Petrobras under long-term agreements. The oil producer provides about 70 percent of Braskem's naphtha needs. Braskem's net debt fell to 2.88 times earnings before items at the end of last year, according to data compiled by Bloomberg.

"The company is still fundamentally sound," John Haugh, a Latin America corporate strategist at Mizuho Securities, said by telephone from New York. "They have done a very good job with their liability management. It looks attractive compared to some other Brazilian BBB names."

Braskem's largest shareholders are Petrobras, state development bank BNDES and Odebrecht SA, Brazil's largest infrastructure company. Odebrecht itself is

> one of 16 builders being investigated by federal police and prosecutors for participating in an alleged cartel to overcharge Petrobras for contracts.
> No Telling
>
> Odebrecht's press office said in an e-mailed statement that it denies the "calumny allegations" made by the Petrobras former director, especially regarding improper payments to any executive, former executives or people related to the state-company.
>
> The statement says that Odebrecht doesn't and has never participated in any kind of cartel.
>
> "Braskem has a big concentration in share ownership by Odebrecht, BNDES and Petrobras," Michael Roche, a strategist at Seaport Global Holdings LLC, said by telephone from New York. "These revelations lead to a quick shedding of this type of risk."
>
> Braskem's 2024 bonds plunged to 93.32 cents on the dollar on Friday, the lowest since they were issued in January 2014, pushing the yield on the notes to 7.49 percent, data compiled by Bloomberg show.
>
> That's 2.7 percentage points more than the average for emerging-market companies that are rated investment grade.
>
> "The concerns regarding Petrobras and corruption have swallowed many companies, and we can clearly see Braskem is another one of them at this moment," Klaus Spielkamp, the head of fixed-income sales at Bulltick LLC in Miami, said by telephone. "People do not know what might come next."

41. On April 2, 2015, the Company filed a Report of Foreign Private Issuer with the SEC on Form 6-K. Therein, the Company, in relevant part, stated:

> Braskem S.A. ("Company or Braskem"), in compliance with CVM Instruction 358/02, as a result of the allegations of improper payments to its benefits in contracts signed with Petróleo Brasileiro S.A. – Petrobras ("Allegations"), hereby announces to its shareholders and the market the following:
>
> 1. The Company has not been subpoenaed in any investigative procedure, in Brazil or abroad, related to the Allegations.
>
> 2. Nevertheless, Braskem proactively initiated an internal procedure of investigation about the Allegations ("Investigation").
> 3. The Company hired law firms in Brazil and in the USA with recognized experience in similar cases to conduct the Investigation, which will be held in accordance with the best international practices in such procedures.

> 4. Braskem has voluntarily contacted the capital markets regulators in Brazil (Securities and Exchange Commission of Brazil - CVM) and in the United States (Securities and Exchange Commission – SEC and Department of Justice – DOJ) by keeping them informed about the progress of the Investigation.

## CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Braskem's securities between June 1, 2010 and March 11, 2015, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Braskem's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Hundreds of thousands of Braskem ADRs were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Braskem or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Braskem; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

47. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

48. The market for Braskem's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Braskem's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Braskem's securities

relying upon the integrity of the market price of the Company's securities and market information relating to Braskem, and have been damaged thereby.

49. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Braskem's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Braskem's business, operations, and prospects as alleged herein.

50. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Braskem's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

51. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

52. During the Class Period, Plaintiff and the Class purchased Braskem's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**SCIENTER ALLEGATIONS**

53. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Braskem, his/her control over, and/or receipt and/or modification of Braskem's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Braskem, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

54. The market for Braskem's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Braskem's securities traded at artificially inflated prices during the Class Period. On June 7, 2011, the Company's stock closed at a Class Period high of $28.16 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities

relying upon the integrity of the market price of Braskem's securities and market information relating to Braskem, and have been damaged thereby.

55. During the Class Period, the artificial inflation of Braskem's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Braskem's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Braskem and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

56. At all relevant times, the market for Braskem's securities was an efficient market for the following reasons, among others:

(a) Braskem stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Braskem filed periodic public reports with the SEC and/or the NYSE;

(c) Braskem regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Braskem was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

57. As a result of the foregoing, the market for Braskem's securities promptly digested current information regarding Braskem from all publicly available sources and reflected such information in Braskem's stock price. Under these circumstances, all purchasers of Braskem's securities during the Class Period suffered similar injury through their purchase of Braskem's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

58. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Braskem who knew that the statement was false when made.

## FIRST CLAIM
## Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

59. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Braskem's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

61. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Braskem's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Braskem's financial well-being and prospects, as specified herein.

63. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Braskem's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Braskem and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

64. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

65. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Braskem's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Braskem's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Braskem's securities during the Class Period at artificially high prices and were damaged thereby.

67. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff

and the other members of the Class and the marketplace known the truth regarding the problems that Braskem was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Braskem securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

70. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71. The Individual Defendants acted as controlling persons of Braskem within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73. As set forth above, Braskem and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 2, 2015

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Lesley F. Portnoy*
Lesley F. Portnoy (LP-1941)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

-and-

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff Carmine Vitolo*

## SWORN CERTIFICATION OF PLAINTIFF

Braskem S.A., **SECURITIES LITIGATION**

I, Carmine Vitolo, certify:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase Braskem S.A., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Braskem S.A., during the class period set forth in the Complaint are as follows:

   See Attached Transactions

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   ___ Check here if you are a current employee or former employee of the defendant Company.

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: 4-17-2015

(Please Sign Your Name Above)

**Carmine Vitolo's Transactions in**
**Braskem S.A. (BAK)**

| Date | Transaction Type | Shares | Unit Price |
|---|---|---|---|
| 10/21/2014 | Bought | 500 | $13.9099 |
| 10/22/2014 | Bought | 200 | $13.6030 |
| 10/23/2014 | Bought | 100 | $13.6531 |